WILLIAM BETTLE, commissioner of banking and insurance of the State of New Jersey,

*v.*

THE REPUBLIC SAVINGS AND LOAN ASSOCIATION.

[Filed August 15th, 1902.]

1. The ordinary shareholders of a building and loan association are not creditors, at least until withdrawal claims have been filed, and in computing the liabilities of the company they should be considered as entitled to what they have paid in, without deducting their proportion of the expenses.

2. Though the insolvency alone of a building and loan association will not in all cases justify the winding up of its business under *P. L. of 1899 p. 366,* providing that an injunction may be granted and a receiver appointed where such an association is insolvent, or exceeding its powers, or violating the law, or where its continuation or methods of business will render its further operation hazardous to the public or to those having funds in its custody, yet where it appears that an association which has been running eight and a half years is not only insolvent, but that the withdrawals have been large, its expenses extravagant and its investments carelessly made, and that there is no probability of maturing the shares of the persistent members within a reasonable time, an injunction will be granted and a receiver appointed.

---

On bill for the appointment of a receiver.

*Mr. Thomas N. McCarter,* attorney-general, for the complainant.

*Messrs. Lindabury, Depue & Faulks,* for the defendant.

REED, V. C.

The defendant is a corporation organized under "An act to encourage the establishment of mutual loan and building associations." *Gen. Stat. p. 331.*

By an act passed in 1899 (*P. L. of 1899 p. 366*) every such corporation is subjected to the inspection and supervision of the department of banking and insurance. By this act it is provided that if it shall appear to the commissioner of banking and insurance, from any examination, that an association is insolvent, or exceeding its powers, or violating the law, or that its condition or methods of business are such as to render the continuation of its operation hazardous to the public or to those having funds in its custody, he shall have authority to apply to the chancellor for an injunction restraining said association from the transaction of further business, and for the appointment of a receiver.

This application is made by the commissioner to restrain the defendant, and for the appointment of a receiver, under the third section of the act just mentioned.

The defendant filed its certificate of incorporation on November 2d, 1893. By article 7, section 3, of its original articles of association, it is provided that short-term stock may be issued, on which the monthly dues shall be fifty cents per share; when $50 shall have been paid on a share, no further payments will be required, and the holder will be entitled to receive thereafter cash dividends of $1.50 every six months until maturity of such shares. Section 4 provides that long-term stock will be issued, on which the monthly dues shall be twenty-five cents per share; when $36 shall have been paid on a share, no further payments will be required, and the holder will be entitled to receive thereafter cash dividends of $1.08 every six months until maturity of such share.

Section 5 provides that the board of directors shall have power to issue, in the name of the corporation, other kinds of stock, to be covered by such regulations as the board of directors may direct.

In addition to the stock on the purely installment plan, the company has issued stock upon payment of a lump sum less than the par value of the certificate. It has also issued stock on which only dividends of six per cent. and eight per cent., respectively, are paid in lieu of further participation in the profits.

The examiners appointed by the commissioner, by authority of the third section of the act of 1899, made a report, dated May 14th, 1902, from which it appeared that the total assets of the defendant were $625,695.19 and its total liability $695,166.68.

The answer of the defendant denies the accuracy of these figures, and asserts that its assets are sufficient to pay its liabilities.

The books of the company show that the association has received from its members, payments on account of dues and installments, exclusive of entrance fees, the sum of $973,822.48.

It has received as profits on account of interest
   and premiums, the sum of.............. $170,103 56
And on account of rents................... 52,801 15

  Making a total of.................:......:.. $222,904 71

In addition, it has received from the members on account of fines and membership fees, additional to the first monthly dues, redemption fees on the payment of loans and miscellaneous expenses returned, the sum of $13,336.15, which, with the previous total, makes the entire sum received on account of profits $236,240.86.

Its expenses have been as follows:

On account of salaries..................... .$207,117 76
Commissions on collections................ 12,086 88
Agents' commissions in addition to first
  monthly dues ........................ 40,523 37
For legal expenses......................... 14,565 08
For furniture ............................ 2,293 68

  The total amount of these expenses is.. $276,586 77

In addition to these expenses, it has paid interest upon mortgages on property owned by the association and interest upon money borrowed by it, to the amount of........ $34,647 31
It has paid for taxes...................... 32,323 92
And for improvements placed upon the real
  estate ............................. 14,902 00

  These three items amount to.........:.. $81,873 23

The total amount of its expenses foot up to $358,460.10. There has also been paid as profits to members the sum of $58,739.80. This sum, as I take it, is made up partly of interest paid upon the six per cent. and eight per cent. interest-bearing certificates.

The expenses in excess of the profits during the life of the association up to the time of filing the report are $122,219.24, exclusive of the amount paid for profits; and including that amount, namely, $58,739.80, the expenses exceed the profits to the amount of $170,959.04.

This amount, therefore, of $170,959.04 has been taken from the money actually paid in by members of the association—money paid in without including the entrance fees also paid by the members, which went to the expense account of the association.

It appears that the association has paid to withdrawing members the sum of $397,277.75. This deducted from the amount actually paid in by members, exclusive of the entrance fees, leaves $576,544.73, but out of this has also been paid for expenses in excess of profits $170,959.04, which leaves of the amount paid in by members, in the hands of the association, the sum of $405,787.93.

This amount of money, therefore, is supposed to be represented by property purchased with it or other property into which such property purchased has been transmuted.

Assuming that this sum has been expended, directly or indirectly by the association, in the acquisition of property, and the property so held is worth its cost, is it sufficient to pay the liabilities of the association?

The liabilities of the association, as found by the examiners and stated in the affidavits of the complainant, excluding the amount due for principal and interest on account of mortgages upon the real estate of the association, and exclusive of the item $11,180 payment due on the property, but which the defendant says has since been paid, leaves the amount of liabilities, according to the examiners' report, $411,375.66.

The first item on this list of liabilities is for the amount due installment shareholders, put at $382,961.69. This liability is

stated by the defendant at $404,600.98. The defendant states that the liabilities of the association at the close of business on April 8th, 1902, exclusive of mortgages assumed and interest thereon, to be $432,741.35.

Taking either estimate of liabilities, it is apparent that if the property owned by the association is worth no more than it cost, the available assets are insufficient to pay those liabilities.

I will now turn to the statement of the assets, concerning the value of which the complainant and defendant differ. The first item consists of first mortgages amounting to $117,762.70. The next item consists of mortgages other than first liens amounting to $31,328. The next item consists of real estate acquired by the association under foreclosure of its mortgages. This item is put in by the complainant at $163,249.61 and by the defendant at $194,818.96. The next item consists of real estate purchased by the association. This property is valued, clear of mortgages, by the complainant at $267,000 and by the defendant at $314,297.74. There are slight differences in the valuation of other property held by the association, but the items already mentioned are those respecting which consideration is important.

The complainant does not challenge the valuation of the first mortgages. In respect to the mortgages other than first liens, their real value does not appear.

Turning to the real estate, it is perceived that this property, up to the value put upon it by the defendant, namely, $194,818.96, was acquired by the act of the association in purchasing it, as mortgagee, to secure themselves against loss. These properties are put in as assets, in the language of the answer, "for what they cost." What is meant by this language is not quite clear.

Of the five pieces so acquired since January 1st, 1901—the pieces mentioned in the report of the examiners—it seems that the Lewis tract and the Hirst tract are put in at the amount at which they were carried on the books of the association. The Kowues tract is put in as an asset at $1,492.65 and was carried on the books of the association at $1,322.66, while the Poole tract, carried at $2,986, is put in as an asset of the value of $1,418.69.

During the same period five pieces of real estate were sold

by the association at a loss of $1,291.97. Now, it seems to me that the fact that $194,818.96 worth of property has been taken in by the association, under its foreclosure proceedings, is a significant circumstance in the management of this company. It indicates injudicious investments. The testimony of officers of the association, relative to their carefulness in having appraisements made of property submitted for loans, and relative to the practice of limiting mortgage loans to two-thirds of the appraised valuation of the property, goes for little in the face of the fact that the association has been compelled to purchase property to save itself against loss on account of these loans, amounting to more than its present holding of first mortgage securities.

It also means that this property is not an available asset to the value at which it is put in by the association.

This is true whether it is put in at the amount of the mortgage debt, or the mortgage debt together with the costs of the foreclosure, or at the sum actually bid for the property at the foreclosure sale.

The other real estate purchased includes seven five-story tenement-houses on East Seventy-third street, New York City. It is subject to mortgages for $112,000, and $38,810.87 was paid by the association for the equity of redemption. This property is put in by the association as worth $151,810.87.

The next property consists of three five-story brick apartment-houses, Nos. 762, 764 and 766 First avenue, New York City, subject to mortgages aggregating $64,000. The defendant paid for the equity of redemption $22,277.94. This property is put in at a valuation of $84,277.94.

The remaining two New York properties were bought during the last year, one No. 1760 First avenue, and the other No. 174 West One Hundred and Thirty-fifth street. These properties were subject to mortgages of $40,000, and $57,000 was paid for the equity of redemption. This purchase was made after the commissioner of banking had intimated his disapproval of further investments in real estate, while $86,000 of withdrawal claims were awaiting payment.

The defendant's account of the circumstances under which

these properties were acquired is as follows: That for $19,500 of the $39,000 paid for the equity in the Seventy-third street property it worked off mortgages which it held, several of which were in arrears, and upon property which had depreciated in value. That of the $22,000 paid for the equity in the properties Nos. 762, 764 and 766 First avenue $5,500 was paid by exchange of a mortgage held by the defendant. Of the amount paid for the equity in the last two properties purchased $10,000 was by exchange of real estate and a mortgage.

The defendant claims that of $74,800, representing the total equity in all the properties, it exchanged for $37,500 mortgages and real estate which had become of doubtful value.

The affidavits and the report of the examiners show that the expenses, including repairs and interest upon the mortgages upon the East Seventy-third street properties, exceeded the income by over $1,000, and besides, the interest on the amount paid for the equity of redemption is lost. There has also been a loss on the houses Nos. 762, 764 and 766 First avenue of $901.21, besides the loss of the interest on the amount paid for the equity of redemption.

The defendant insists that, in arriving at the results, expenses for repairs are charged for what were really permanent improvements; and also insists that, on May 1st, the properties were yielding rentals in excess of fixed charges, a total of $5,300.33.

The purchase of these New York properties was, obviously, a speculative enterprise. No one would have thought of purchasing them as an investment of money held in trust for any purpose. Indeed, the only excuse offered for the deal is that it afforded a way of disposing of other mortgages worth less than the amount loaned, and other real estate worth less than the amount for which it was carried. Being purchased in this way, it would be strange if these New York properties are worth what they nominally cost. The property is tenement property, still out of repair, notwithstanding the charges in the items of expenses for permanent improvements. I doubt if the property would realize to-day the amount which the complainant concedes it to be worth. Its value in excess of this must depend upon the increase in the value of property in the neighborhood some

time in the future.   I am convinced that now it is not a profit-producing investment, and will not be for some time.

My consideration of the affidavits produced by the complainant and defendant has convinced me that the assets of the association are not merely inadequate, but greatly insufficient to liquidate the liabilities of the association.   It is insisted, however, that, in arriving at the liabilities of the company, the present shareholders are not entitled, under their contract with the association, to an amount of money equal to what they have paid in, either·with or without profits; but are only entitled to such an amount as they have paid in after deducting their proportion of the expenses.

But the members are not withdrawing shareholders, and, in fact, are not creditors.   A corporation of this kind is *sui generis.* The ordinary shareholders are not creditors, at least until withdrawal claims have been filed.   The ordinary debts are those which have accrued for salaries, commissions, rents, stationery and other current expenses.

In solving the question of the insolvency of an association of this kind, the ordinary rule applied to corporations is inapplicable.   Insolvency has been judicially said to be predicable of these associations when the assets are insufficient to repay the amount of money which the shareholders have actually paid in.   *End. Build. Asso. § 511; Thomp. Build. Asso. § 289; Towle* v. *Building and Loan Association, 61 Fed. Rep. 446; Chapman* v. *Young, 65 Ill. App. 131; Commonwealth* v. *Pennsylvania Building and Loan Association, 20 Pa. Co. Ct. Rep. 589.*

I do not think, as a universal rule, such a condition will, in all cases, justify the appointment of a receiver.   As was pointed out in *Weir* v. *Granite State Provident Association, 11 Dick. Ch. Rep. 234, 241,* risk of loss by mismanagement is inherent in the character of the scheme, and the winding up by a receiver entails injury upon the non-borrowing class of shareholders.

If, in the earlier stages of its existence, a building loan association should, by a loss which does not result from inexcusable mismanagement, have its assets reduced below the aggregate amount paid in by the shareholders, but it nevertheless seems probable that while the life of its shares may be prolonged they

can be matured, I would not appoint a receiver. But in this instance the association has been running for eight and one-half years. The withdrawals, whatever the cause, have been unusually large. Interest at four per cent. is accumulating upon the amounts due the unpaid withdrawing shareholders. The expenses of the association have been extravagant. The investments have been carelessly made. In my judgment there is no probability of maturing the shares of the persistent members within a reasonable time, or by the assistance of any profits.

I think, within the meaning of the term as applied to these associations, the defendant is to be regarded as insolvent. But, regardless of that, its condition and methods of business are such as to render the continuation of its operations hazardous to the public and those having funds in its custody—hazardous to those who may be induced to become members and to those present members now depending upon the assets of the association for the payment of their shares.

I will allow an injunction and appoint a receiver.